**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SYNTHEON, LLC,<br><br>                    Plaintiff,<br>v.<br><br>COVIDIEN AG,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. NO. 16-10244-ADB

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

SYNTHEON, LLC

By its attorneys,

Richard J. Yurko (BBO# 538300)
Douglas W. Salvesen (BBO# 550322)
Anthony B. Fioravanti (BBO# 664823)
YURKO, SALVESEN & REMZ, P.C.
One Washington Mall
Boston, MA 02108
(617) 723-6900

Ann Lamport Hammitte (BBO No. 553263)
Thomas P. McNulty (BBO No. 654564)
LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA  02142
(617) 395-7000

Dated: January 30, 2017

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ................................................................................................ 1

SUMMARY OF FACTS SUPPORTING SUMMARY JUDGMENT ........................................ 2

    A.  Syntheon Develops Technology For Medical Device Manufacturers. ............................. 2

    B.  Under The Parties' 2008 Asset Purchase Agreement, Covidien's Obligation To Pay Royalties To Syntheon Is Based On Patents That Are Issued On Syntheon's Technology. ...................................................................................... 2

    C.  Syntheon Has A Contractual Right To File And Prosecute Any Patent Application That Covidien Has Chosen Not To File........................................................ 3

    D.  Covidien Incorporated Syntheon's Two-Stage Switch Into The LigaSure Small Jaw Open Instrument. ................................................................................. 5

    E.  Covidien Acknowledged That There Was A "Divergence" Between Covidien And Syntheon Over The Patent Prosecution Of The Two-Stage Switch Technology ............. 6

    F.  Covidien Limited The Scope Of The Pending Patent Applications. ............................... 7

    G.  Covidien Unreasonably Refused To Allow Syntheon To File And Prosecute The January 2016 Patent Applications At Its Own Cost. .................................................. 8

ARGUMENT ..................................................................................................... 9

    A.  Summary Judgment Is Appropriate Where The Reasons For Covidien's Refusal To Permit Syntheon To File The Patent Applications Are Factually Undisputed............ 9

    B.  A "Reasonable Consent" Clause Is Used To Ensure That A Party To A Contract Is Not Deprived Of Any Of The Benefits Under The Contract. ................................... 11

    C.  Since Covidien Does Not Contend That It Would Be Deprived Of Any Of The Benefits Under The Parties' Agreements, Its Refusal To Allow Syntheon To File The Two Patent Applications Is Unreasonable As A Matter Of Law. ........................... 14

    D.  Under The Doctrine Of Primary Jurisdiction, The Issue Of Whether Claims In The Patent Applications Will Be Allowed Should Be Made By The PTO. .................... 16

    E.  In The APA, The Parties Have Expressly Agreed That The Court May Specifically Enforce The Terms Of Their Agreement..................................................... 18

CONCLUSION ................................................................................................... 19

<u>TABLE OF AUTHORITIES</u>

Page

<u>CASES</u>

<u>1010 Potomac Assoc. v. Grocery Mfrs. of Amer., Inc.</u>, 485 A.2d 199 (D.C. 1984) .................. 13

<u>B.M.B. Corp. v. McMahan's Valley Stores</u>, 869 F.2d 865 (5th Cir. 1989)................................ 13

<u>Carmona v. Toledo</u>, 215 F.3d 124 (1st Cir. 2000) ........................................................ 10

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) .......................................................... 10

<u>Chapman v. Katz</u>, 448 Mass. 519 (2007)....................................................... 12, 13, 15

<u>Chrysler Capital Corp. v. Lavender</u>, 934 F.2d 290 (11th Cir. 1991)......................................... 13

<u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1 (1st Cir. 2003) ...................................... 10

<u>Ernst Home Center, Inc. v. Sato</u>, 80 Wash. App. 473, 910 P.2d 486 (1996)........................ 12 n.6

<u>F.H.R. Auto Sales v. Scutti</u>, 144 A.D.2d 956, 534 N.Y.S. 2d 266 (N.Y. 1988)........................ 13

<u>Gomez v. Stop & Shop Supermarket Co.</u>, 670 F.3d 395 (1st Cir. 2012).................................... 10

<u>Halper v. Demeter</u>, 34 Mass. App. Ct. 299 (1993) ...................................................... 12

<u>Hannon v. Beard</u>, 645 F.3d 45 (1st Cir. 2011)............................................................ 10

<u>Mashpee Tribe v. New Seabury Corp.</u>, 592 F.2d 575 (1st Cir. 1979) ........................................ 17

<u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5 (1st Cir. 1990) ..........................10-11

<u>Nansamba v. North Shore Med. Ctr., Inc.</u>, 727 F.3d 33 (1st Cir. 2013)..................................... 10

<u>Nassif v. Boston & Me. R.R.</u>, 340 Mass. 557 (1966) .................................................. 12

<u>Ocasio-Hernandez v. Fortuño-Burset</u>, 777 F.3d 1 (1st Cir. 2015)............................................ 10

<u>Posadas de Puerto Rico, Inc. v. Radin</u>, 856 F.2d 399 (1st Cir. 1988)......................................... 11

<u>Reiter v. Cooper</u>, 507 U.S. 258 (1993) ................................................................. 16

<u>Rey v. Lafferty</u>, 990 F.2d 1379 (1st Cir. 1993) ....................................................13-14

<u>Ring v. MPath Interactive, Inc.</u>, 130 Fed. Appx. 501 (2d Cir. 2005) .................................. 12 n.6

Page

CASES (cont.)

U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., 339 F.3d 23 (1st Cir. 2003)............... 16

United States v. W. Pac. R.R., 352 U.S. 59 (1956) .................................................................... 17

Worcester-Tatnuck Sq. CVS, Inc. v. Kaplan, 33 Mass. App. Ct. 499 (1992) ............................ 12

Young v. Wells Fargo Bank, N.A., 828 F.3d 26 (1st Cir. 2016) ................................................. 11


STATUTES

35 U.S.C. § 2 (2006) .................................................................................................................. 17


COURT RULES

Fed. R. Civ. P. 56(a) ................................................................................................................... 9


MISCELLANEOUS

David L. Schwartz, Practice Makes Perfect? An Empirical Study of Claim
Construction Reversal Rates in Patent Cases, 107 Mich. L. Rev. 223 (2008)...................... 17 n.9

iii

## INTRODUCTION

In 2008, Plaintiff Syntheon, LLC and Defendant Covidien AG entered into an Asset Purchase Agreement ("APA") under which Covidien purchased medical device technology being developed by Syntheon. Under the APA, Covidien assumed responsibility for prosecuting a number of pending patent applications relating to the technology and for filing additional applications in the future. Among other consideration, Covidien agreed to pay Syntheon a royalty on sales of any product covered by any claim in a patent that issued from these patent applications. To protect Syntheon's continuing interest in the pending and future patent applications, the parties agreed that Syntheon could request that Covidien file additional patent applications to protect the technology and Syntheon's rights to royalties. If Covidien decided not to file any new patent application regarding the technology purchased from Syntheon or derived therefrom, Syntheon had the right to prepare and file the patent application itself. Syntheon's right to file a patent application was subject to Covidien's approval, which could not be "unreasonably withheld."

In 2015 and 2016, Syntheon requested that Covidien file two continuation patent applications relating to an innovative two-stage switch developed by Syntheon. Covidien decided not to file the applications. Syntheon suspected that Covidien's refusal to file the applications was to avoid paying royalties to Syntheon on the patents that would issue from the two applications. Syntheon requested that Covidien allow Syntheon to file the applications itself, at Syntheon's own cost. Covidien denied that request, claiming that the proposed patents would likely not be granted and, even if they were granted, would not provide any commercial value to Covidien.

Syntheon seeks to have the Court enter a judgment in accordance with Rule 56 permitting Syntheon to file and prosecute with the U.S. Patent Office the two patent applications to further

protect its two-stage switch technology. Covidien's reasons for denying Syntheon's right to file the proposed applications are not in dispute. As explained below, since Covidien has failed to identify any possible harm to it from the applications, which applications would only further protect Covidien's interest in the parties' agreements, its refusal to permit Syntheon to file and prosecute the applications is unreasonable as a matter of law. Consequently, Syntheon is entitled to a judgment that it may file and prosecute the two proposed patent applications.

## SUMMARY OF FACTS SUPPORTING SUMMARY JUDGMENT[1]

### A.     Syntheon Develops Technology For Medical Device Manufacturers.

Syntheon, a Florida limited liability company located in Miami, is engaged in the business of designing and developing new medical devices. Typically, once Syntheon completes the development of a new medical device, it will license the technology to another company that will market the product. To date, the four principals of Syntheon have a cumulative total of 95 years of product development in the medical field and are named as inventors on over 200 issued patents. *Plaintiff's Statement of Material Facts ("Statement of Facts"), ¶¶ 1, 2, 4; McBrayer Aff., ¶ 3.*

### B.     Under The Parties' 2008 Asset Purchase Agreement, Covidien's Obligation To Pay Royalties To Syntheon Is Based On Patents That Are Issued On Syntheon's Technology.

In 2007 and 2008, Syntheon was developing a cordless ultrasonic scalpel and had filed more than a dozen patent applications with the U.S. Patent Office ("PTO") to protect innovations to the scalpel's handle, its transducer, its assembly, and various other features. Syntheon agreed

---

[1]  This is a summary of the relevant facts that are set out in more detail in the Plaintiff's Statement of Material Facts and in the Affidavits of Mr. Sean McBrayer and Douglas W. Salvesen, Esq., filed herewith.

to sell these pending patent applications, together with the associated intellectual property and any intellectual property derived therefrom, to Covidien. Covidien is a Swiss corporation and, presently, a subsidiary of Medtronic Plc, reportedly the world's largest stand-alone medical technology development company. *Statement of Facts, ¶¶ 3, 5-6; McBrayer Aff., ¶¶ 4-5.*

Under the relevant terms of the parties' December 2008 Asset Purchase Agreement ("APA"), Covidien agreed to pay Syntheon, in addition to other consideration, royalties on net sales of any "covered product." APA, § 2.6(b). The term "covered product" is defined broadly in the APA to include "any product" that is within the scope of a patent that issues from the patent applications sold to Covidien, and expressly includes a patent subsequently granted by way of a continuation, continuation-in-part, and/or a divisional patent application.[2] APA, § 1.1 ("Covered Product"). Consequently, Covidien may incorporate the intellectual property developed by Syntheon into any medical device and will owe royalties to Syntheon on sales of the medical device when a patent issues on that intellectual property. *Statement of Facts, ¶¶ 8-10; McBrayer Aff., ¶ 5.*

### C.     Syntheon Has A Contractual Right To File And Prosecute Any Patent Application That Covidien Has Chosen Not To File.

Since Covidien's obligation to pay royalties is explicitly tied to "issued patents," it was and is important to Syntheon that Covidien zealously file, prosecute, and maintain the intellectual property rights that are subject to the APA to the fullest extent permitted under the patent

---

[2]  Continuation, continuation-in-part (CIP), and divisional patent applications are applications filed during the lifetime of an earlier co-pending nonprovisional patent application that claim priority to the earlier-filed application.  Continuations and divisionals have the same specification as the parent application, but claim different aspects of the inventions disclosed therein. A CIP may repeat some substantial portion or all of the earlier application, but usually adds matter not disclosed in the earlier application.

3

laws. To that end, though the parties agreed that in the first instance Covidien would be

responsible for the continued prosecution of the pending patent applications and for the filing

and prosecution of any ensuing patent applications, Syntheon retained important rights. Most

significantly, if Covidien determined not to file any new patent application regarding the

intellectual property purchased from Syntheon or derived therefrom, Syntheon has the

contractual right to prepare and file the patent application itself, subject to Covidien's approval,

which shall not be unreasonably withheld (hereinafter, the "'Reasonable Consent' Clause").

Specifically, Section 7.8 of the APA provides as follows:

> 7.8   <u>Patent Filing and Prosecution.</u>
>
> (c)   If Covidien AG determines not to file any particular Patent Application in
> the Specified Countries, or determines not to file any new Patent Application
> regarding an invention contained in the Transferred Intellectual Property as
> disclosed by [Syntheon], Covidien AG shall timely notify [Syntheon] of such
> determination, and following such notification [Syntheon] may, upon Covidien
> AG's prior written approval (which, after review of any such Patent Application,
> shall not be unreasonably withheld), in good faith prepare and file any such
> application at [Syntheon]'s sole and exclusive cost and expense and shall provide
> Covidien AG with copies of all documents filed by [Syntheon] with respect to
> such application. All Patent Applications filed by [Syntheon] as set forth above
> shall be assigned to, and exclusively owned by, Covidien AG.

APA, § 7.8(c).[3]

Other provisions of the APA likewise sought to protect Syntheon's rights in the patent

prosecution process. Pursuant to Section 7.8(b), Covidien is required to provide Syntheon with

"the opportunity to review and comment on any new Patent Application and substantive

responses to be filed with any patent office regarding" any of the intellectual property sold to

---

[3]  Although there is a dispute in this action whether Syntheon's rights arise under the APA or the
parties' Development Agreement, a related agreement that the parties also executed in 2008 (a
copy of which is attached as Exhibit B to the McBrayer Affidavit), that dispute is not material
here since the Development Agreement includes similar language relative to Syntheon's rights to
file a patent application. <u>See</u> *Statement of Facts, ¶ 12; McBrayer Aff., ¶ 5, Ex. B § 9.3(b).*

Covidien. Section 7.8(d) provides that Covidien "shall not abandon, cancel or otherwise compromise" any issued patent on which royalties are being paid. Furthermore, Covidien is obligated to prosecute these applications "diligently" and "in good faith," among other things, and to "use the same degree of care that Covidien AG uses in the normal course of filing, registering and prosecuting its own Intellectual Property." APA, § 7.8(d). More broadly, Covidien may not preclude Syntheon from receiving the benefits of the APA and "shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement." APA, § 7.7. *Statement of Facts, ¶ 13; McBrayer Aff., ¶ 5, Ex. A.*

### D.    Covidien Incorporated Syntheon's Two-Stage Switch Into The LigaSure Small Jaw Open Instrument.

One of the technologies developed by Syntheon for the cordless ultrasonic scalpel was an innovative two-stage switch. Unlike an ordinary switch, the two-stage switch permitted the user to easily perceive, via a tactile feedback, two distinct levels or stages as the switch was being depressed. A surgeon using a medical device with a two-stage switch could consciously and intuitively operate the device between two conditions corresponding to the two stages of the switch. Syntheon believed that the presence of the two-stage switch on the cordless ultrasonic scalpel was one of the reasons for the scalpel's popularity with surgeons. Since December 2008, Covidien has filed and prosecuted several patent applications for various aspects of the technology to insure that the intellectual property rights in this technology are fully protected.

*Statement of Facts, ¶¶ 14-17; McBrayer Aff., ¶¶ 6-9.*

Syntheon suspected that Covidien had incorporated the two-stage switch technology that Syntheon had developed for the ultrasonic scalpel into one of Covidien's other medical devices, the LigaSure™ Small Jaw Open Instrument (the "LigaSure Instrument"). Beginning in 2013, and over the ensuing months, Syntheon requested that Covidien review some of the patents that had issued on the two-stage switch technology to confirm that royalties were due to Syntheon on sales of the LigaSure Instrument. At a meeting in April 2015, Syntheon notified Covidien that it believed that the LigaSure Instrument was "covered" by one or more of the issued patents. *Statement of Facts, ¶¶ 18-20; McBrayer Aff., ¶¶ 10-11.*

**E.     Covidien Acknowledged That There Was A "Divergence" Between Covidien And Syntheon Over The Patent Prosecution Of The Two-Stage Switch Technology.**

In January 2015, Covidien acknowledged to Syntheon that there was a "potentially growing divergence between their respective Covidien's and Syntheon's interests" regarding the patent prosecution of the two-stage switch technology. *Statement of Facts, ¶ 21; McBrayer Aff., ¶ 12.*

At that time, the patent counsel that Covidien was using to prosecute patent applications under the parties' agreements, Mayback & Hoffman, P.C., also represented Syntheon in unrelated matters. Because of the "growing divergence" between the parties' interests, Covidien decided to replace Mayback & Hoffman, P.C. as patent counsel. At that time, there were two patent applications pending before the PTO that would expand the patent protection of the two-stage switch technology: Divisional Application No. 14/231,042 ('042 Application) and Continuation-in-Part Application No. 14/607,358 ('358 Application). *Statement of Facts, ¶¶ 22-24; McBrayer Aff., ¶ 13-14.*

Between May and July 2015, there were a series of events relative to these pending patent applications that Covidien did not disclose to Syntheon until August. In May 2015, the PTO issued favorable notices with respect to both applications. The PTO notified Covidien that the claims in the '042 Application were similar to the claims of patent previously issued to Covidien on the two-stage switch technology.[4] The PTO also notified Covidien that it would issue a patent on the '358 Application. *Statement of Facts, ¶¶ 25-28; McBrayer Aff., ¶¶ 15-16.*

On July 20, 2015, after receiving these two favorable notices, Covidien filed an Information Disclosure Statement ("IDS") with the PTO as part of the prosecution of the '042 Application. In the IDS, Covidien identified prior art which Covidien purported to be relevant to '042 Application. *Statement of Facts, ¶¶ 29-30; McBrayer Aff., ¶ 17.*

In July 2015, again without any notice to Syntheon, Covidien's in-house counsel and its outside patent counsel travelled to Alexandria, Virginia to meet with the Patent Examiner to discuss the prior art that Covidien claimed was relevant to the pending Applications. The Patent Examiner subsequently suggested, presumably based on the representations made by Covidien, that the claims in the '042 Application be amended and narrowed. *Statement of Facts, ¶¶ 31-32; McBrayer Aff., ¶¶ 18-19.*

### F.     Covidien Limited The Scope Of The Pending Patent Applications.

When Covidien finally disclosed to Syntheon what it had done, Covidien proposed amending the '042 Application (and later, the '358 Application) and restricting the claims. Perhaps not coincidentally, the proposed restrictions would also weaken any assertion that the patent that issued on the application would cover the LigaSure Instrument, which Syntheon

---

[4]  Such instances of "double patenting" are typically resolved by having the patent holder file a terminal disclaimer, which causes the second patent to expire on the same date as the first.

believes had been Covidien's aim all along. *Statement of Facts, ¶¶ 33-35; McBrayer Aff., ¶ 20.*

Syntheon disagreed with Covidien's suggested response and provided a proposed set of alternative claims. Syntheon requested that Covidien file its proposed amended claims, which were broader than those proposed by Covidien, and which Syntheon believed would be allowable over the additional prior art submitted to the PTO. Instead of making the arguments suggested by Syntheon to overcome the issues raised by the prior art, Covidien rejected Syntheon's proposed submission and proceeded to file its response. *Statement of Facts, ¶¶ 36-38; McBrayer Aff., ¶¶ 21-22.*

### G. Covidien Unreasonably Refused To Allow Syntheon To File And Prosecute The January 2016 Patent Applications At Its Own Cost.

Following the parties' disagreement as how to respond to the PTO, Syntheon requested that Covidien allow it to file a patent application containing the broader claims. In January 2016, Syntheon wrote to Covidien and requested approval pursuant to the "Reasonable Consent" Clause to file, at Syntheon's own cost, the patent application that was enclosed with the letter. A few days later, Syntheon sent Covidien a second patent application and requested that Covidien file that application or allow Syntheon to file it in accordance with the provisions of the APA (the two patent applications that Syntheon seeks to file are referred to hereinafter as the "Patent Applications" or "Applications" and are attached to the McBrayer Affidavit as Exhibit F and Exhibit G). *Statement of Facts, ¶¶ 39-41; McBrayer Aff., ¶¶ 23-25.*

Thereafter, in a series of letters, Covidien informed Syntheon that it would <u>not</u> allow Syntheon to file either of the two Patent Applications. In those letters, Covidien stated that it had withheld its approval for two reasons: (1) because Covidien believed that if the Patent Applications were filed the claims therein would not be allowed by the PTO; and (2) because Covidien

believed that, even if the claims in the proposed Patent Applications were patentable, the resulting patents would not provide any additional meaningful patent protection or commercial value to Covidien. *Statement of Facts, ¶¶ 42-43; McBrayer Aff., ¶ 26*, Exs. H-K.

Importantly, Covidien did not contend, and could not contend, that the filing of the Patent Applications would deprive Covidien of any of the benefits of the APA or the parties' other agreements. *Statement of Facts, ¶ 44; McBrayer Aff., ¶ 27*.

## ARGUMENT

Syntheon seeks partial summary judgment to secure its contractual right to file the Patent Applications at its own cost and direction. Under the "Reasonable Consent" Clause of the APA, Covidien's approval allowing Syntheon to file the Patent Applications may not be "unreasonably withheld." In this case, where the reasons for Covidien's decision are not disputed,[5] and it is equally undisputed that the Patent Applications, if allowed, will not deprive Covidien of any of the benefits of the parties' agreements, Covidien's refusal to allow Syntheon to file the Patent Applications is unreasonable as a matter of law. Syntheon is entitled to summary judgment.

### A.   Summary Judgment Is Appropriate Where The Reasons For Covidien's Refusal To Permit Syntheon To File The Patent Applications Are Factually Undisputed.

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the

---

[5]  Syntheon believes that Covidien's refusal is really motivated by its desire to restrict the royalties owed to Syntheon on the sales of its LigaSure Instrument. However, for the purposes of this Motion, Covidien's motives are immaterial and Syntheon need not impugn them.

controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation

omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable

trier could decide the fact either way." Id. (citation omitted).

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must point to "specific evidence in the record that would be admissible at trial." Ocasio-

Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively

produce evidence that negates an essential element of the non-moving party's claim,' or, using

'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to

carry its burden of persuasion at trial.'" Id. at 4-5, quoting Carmona v. Toledo, 215 F.3d 124, 132

(1st Cir. 2000). "One of the principal purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317,

323–24 (1986). Once the movant takes the position that the record fails to make out any trial-

worthy question of material fact, "it is the burden of the nonmoving party to proffer facts

sufficient to rebut the movant's assertions." Nansamba v. North Shore Med. Ctr., Inc., 727 F.3d

33, 40 (1st Cir. 2013) (citation omitted).

In reviewing the record, the Court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's favor."

Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this standard "is favor-

able to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645

F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and

material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the

Court may discount "conclusory allegations, improbable inferences, and unsupported specula-

tion." Cochran, 328 F.3d at 6, quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5,

8 (1st Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Medina-Muñoz</u>, 896 F.2d at 8. Summary judgment is particularly appropriate where the only material issue requires the interpretation of a contract which, under Massachusetts law, "is ordinarily a question of law for the court." <u>Young v. Wells Fargo Bank, N.A.</u>, 828 F.3d 26, 32 (1st Cir. 2016).

It is also significant that the parties in this action have waived their rights to a jury. In a non-jury trial, where the Court is the ultimate trier of fact, the Court may grant summary judgment where a trial on the issues would not enhance its ability to draw inferences and conclusions. <u>Posadas de Puerto Rico, Inc. v. Radin</u>, 856 F.2d 399, 400-01 (1st Cir. 1988) ("Where the relevant facts are undisputed and, as in this case, the remaining issue is one of law for the court to decide, an evidentiary hearing is not mandated. A trial judge may freely grant summary judgment on a non-jury issue if no dispute over material fact exists and a trial or hearing would not enhance its ability to decide the issue").

### B.   A "Reasonable Consent" Clause Is Used To Ensure That A Party To A Contract Is Not Deprived Of Any Of The Benefits Under The Contract.

The "Reasonable Consent" Clause provides, in relevant part, that for any patent application that Covidien chooses not to file itself, "[Syntheon] may, upon Covidien AG's prior written approval (which, after review of any such Patent Application, shall not be unreasonably withheld), in good faith prepare and file any such application at [Syntheon]'s sole and exclusive cost and expense." APA, § 7.8(c).

Contractual provisions, like the "Reasonable Consent" Clause, are commonly used by contracting parties to entertain an anticipated future event, the details of which are not known at the time of execution, which may provide a benefit to one of the parties. To ensure that the other

party will not thereby be deprived of its contractual benefits, the clause grants to that party the

power to withhold consent to the proposed change. The clause appears in commercial leases

regarding the tenant's right to sublet the premises during the term of the lease, in shareholder

agreements regarding the shareholder's right to convey her shares in the future, in indemnity

contracts regarding an insured's right to settle litigation that may arise, in automobile franchise

agreements regarding the franchisee's ability to sell its dealership at a later date, and in many

other types of contracts.

Under Massachusetts law,[6] when deciding whether or not to consent, a contracting party

must act in accordance with an objective standard of reasonableness and consider only those

factors that relate to protecting the party's interest in the contract.[7] Nassif v. Boston & Me. R.R.,

340 Mass. 557, 565 (1966) ("The words, 'which approval shall not be unreasonably withheld,'

prescribe that the railroad shall act in accordance with usual standards of reasonableness");

Chapman v. Katz, 448 Mass. 519, 531 (2007) ("In a commercial context, only factors which

relate to a landlord's interest in preserving the property or in having the terms of the prime lease

performed should be considered….A landlord's personal taste and convenience, on the other

hand, are not factors properly considered"), quoting Worcester-Tatnuck Sq. CVS, Inc. v. Kaplan,

33 Mass. App. Ct. 499, 503-04 (1992); Halper v. Demeter, 34 Mass. App. Ct. 299, 305 (1993)

(determination of whether defendant unreasonably withheld consent required consideration of

---

[6]  The parties contractually agreed that any dispute between them would be governed by Massachusetts law. See APA, § 9.9(a).

[7]  This is the rule in a majority of jurisdictions. See, e.g., Ring v. MPath Interactive, Inc., 130 Fed. Appx. 501, 503 (2d Cir. 2005) (under New York law, "where a landlord promises that consent to assignment will not be withheld unreasonably, the refusal to consent must be based on a consideration of objective factors"); Ernst Home Center, Inc. v. Sato, 80 Wash. App. 473, 484, 910 P.2d 486, 492 (1996) (noting that a "majority of jurisdictions" hold that such a contractual term requires a court to apply the "reasonably prudent person in the landlord's position" test).

objective factors relating to the defendant's interest in the property and the lease).

A party may not base its decision on factors outside of the parties' contract, seek to obtain benefits beyond those granted by the contract, or refuse to consent when its interests in the contract are fully protected. Chapman, 448 Mass. at 531 (determining "it is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position"). See also B.M.B. Corp. v. McMahan's Valley Stores, 869 F.2d 865, 869 (5th Cir. 1989) ("it is unreasonable for the landlord to condition consent to a transfer on a change in the terms and conditions of the original lease"); Chrysler Capital Corp. v. Lavender, 934 F.2d 290, 294 (11th Cir. 1991) (recognizing "a refusal to consent may be considered arbitrary and unreasonable if the landlord conditions his consent upon approval of a new agreement that changes the terms of the original lease"); 1010 Potomac Associates v. Grocery Mfrs. of America, Inc., 485 A.2d 199, 210 (D.C. 1984) ("[A] landlord has no reasonable basis for withholding consent if the landlord remains assured of all the benefits bargained for in the prime lease"); F.H.R. Auto Sales v. Scutti, 144 A.D.2d 956, 534 N.Y.S. 2d 266 (N.Y. 1988) (where a landlord affirmatively promises not to unreasonably withhold its consent, its refusal can only be based upon a consideration of objective factors, such as the financial responsibility of the subtenant's, the subtenant's suitability for the particular building, the legality of the proposed use and the nature of the occupancy).

The First Circuit considered a similar contractual provision in Rey v. Lafferty, 990 F.2d 1379 (1st Cir. 1993), a case involving the licensing rights to "Curious George." In that case, the parties' contract provided that "Curious George" products proposed by the licensee had to be submitted to Margaret Rey, the character's creator, for her approval, with the stipulation that "[p]roduct approval will not be unreasonably withheld." During the term of the contract, Rey

was asked to consider a proposed "Curious George" children's pajama that was to be marketed by Sears. Rey rejected the proposal on the grounds that the pajama material was "hard, ugly [and] bright yellow," and the emblazoned image of "Curious George" was "plump" and "not recognizable."

The First Circuit considered the extent of Rey's right to consent under Massachusetts law. It held that Rey's right to withhold product approval was circumscribed by the "unreasonably withheld" language in the contract. Rey could not withhold approval for any reason and "the reason for withholding product approval could not be so preclusive as to frustrate the <u>fundamental</u> <u>contractual</u> <u>assumptions</u> on which [the parties' contract] was formed." <u>Id.</u> at 1393 (emphasis in original). The First Circuit stated that, under Massachusetts law, Rey could withhold her approval only for a reason that was material to Rey's interest in the mark that was the subject of the licensing agreement, <u>Rey</u>, 990 F.2d at 1393-94 (approval can be withheld only for reasons reasonably related to the integrity and commercial value of Rey's artistic creation). The First Circuit concluded that since Rey's refusal was related to her concern that the proposed products would damage her interest in the mark, which was the subject matter of the licensing agreement, her refusal to consent was not unreasonable.

## C. Since Covidien Does Not Contend That It Would Be Deprived Of Any Of The Benefits Under The Parties' Agreements, Its Refusal To Allow Syntheon To File The Two Patent Applications Is Unreasonable As A Matter Of Law.

In this case, the purpose of the "Reasonable Consent" Clause is to ensure that any patent applications that Syntheon intends to file will not damage Covidien's rights in the intellectual property purchased under the parties' agreements. Since it is undisputed that the Patent Applications that Syntheon seeks to file would <u>expand</u> the patent protection for that intellectual property, and would not prejudice Covidien's interest in the parties' agreements in any way, any refusal by

Covidien to consent to the filings is unreasonable as a matter of law. Moreover, neither of the reasons that were actually asserted by Covidien as justification for its refusal is reasonable under Massachusetts law.

Covidien initially denied Syntheon's request to file the Patent Applications on the asserted grounds that Covidien believed that it already had enough patents on the two-stage switch technology. Covidien claimed that the patent protection sought by Syntheon would not provide any meaningful additional patent protection to Covidien beyond existing patents and so would be of no value to Covidien. Syntheon disagrees. But since this issue is not material, the Court is not required to resolve this disagreement. Under Massachusetts law, where there is no contention that Covidien would be deprived of any contractual benefit, the fact that Covidien might not receive any additional benefit from the Patent Applications is not a reasonable grounds to refuse to consent to Syntheon's request to be permitted to file the Applications itself. See Chapman, 448 Mass. at 531 (determining "it is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position").[8]

A few weeks after its initial response, Covidien refused to permit the Patent Applications to be filed because, in its opinion, the Applications would not be allowed by the PTO. Covidien argued that the claims in the Patent Applications were unpatentable in light of prior art and were undermined by a defective priority claim. Shortly thereafter, Covidien argued that the Patent Applications would also be denied because the proposed claims contain limitations that Covidien

---

[8]  While the absence of any additional benefit is not a legally cognizable reason to refuse to permit Syntheon to file the Patent Applications, it is certainly a valid reason for Covidien to choose not to file the Applications itself. In fact, the reasons relied on by Covidien for refusing to approve Syntheon's request are, in reality, simply reasons for Covidien to not file the Patent Applications. Where Covidien cannot identify any prejudice to it, there is no good reason to deny Syntheon's request to file the Applications at its own cost.

contends are not supported by the original specifications. Covidien's assertions concerning the

patentability of the claims in the Patent Application also are immaterial and do not provide any

grounds for denying Syntheon's request to file the Applications since, even if the claims were to

be denied, Covidien will not suffer any prejudice to its rights under the parties' agreements.

Moreover, under the rationale of the federal court doctrine discussed below, the issue of whether

a claim is or is not patentable should be decided by the Patent Office and not by this Court.

     **D.**     **Under The Doctrine Of Primary Jurisdiction, The Issue Of Whether Claims In The Patent Applications Will Be Allowed Should Be Made By The PTO.**

Obviously, Syntheon disputes Covidien's assertions that the claims are not patentable and

remains assured that, after the Patent Applications are filed, the claims will be allowed. But this

Court need not – and should not – undertake to determine whether the claims in the Patent Appli-

cations are patentable over the existing prior art. The doctrine of primary jurisdiction requires

this Court to leave the decision on the patentability of the claims in the Patent Applications to the

PTO, the entity established for this very purpose by Congress more than two hundred years ago.

As explained by the Supreme Court, the primary jurisdiction doctrine:

> is a doctrine specifically applicable to claims properly cognizable in court that
> contain some issue within the special competence of an administrative agency. It
> requires the court to enable a 'referral' to the agency, staying further proceedings
> so as to give the parties reasonable opportunity to seek an administrative ruling.

Reiter v. Cooper, 507 U.S. 258, 268 (1993). See also U.S. Pub. Interest Research Grp. v. Atl.

Salmon of Me., 339 F.3d 23, 34 (1st Cir. 2003) ("[T]he primary jurisdiction doctrine permits and

occasionally requires a court to stay its hand while allowing an agency to address issues within

its ken").

The doctrine is particularly appropriate "in cases raising issues of fact not within the conventional experience of judges." United States v. W. Pac. R.R., 352 U.S. 59, 64 (1956). In those cases, the doctrine permits federal courts to invoke "the expert and specialized knowledge of the agencies involved." Id. See also Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 (1st Cir. 1979) (primary jurisdiction doctrine is intended to "promote uniformity and take advantage of agencies' special expertise").

The issue of whether claims in a patent application are patentable is plainly within the "special competence" of the PTO, given that the PTO is tasked with deciding this very question for every patent application filed in the United States. See 35 U.S.C. § 2 (2006). Likewise, the questions raised by Covidien, such as whether a given invention is patentable over the prior art, often involve "issues of fact not within the conventional experience of judges." W. Pac. R.R., 352 U.S. at 64 (citation omitted). Resolution of these matters turns on extremely technical and abstruse issues of fact. Particularly for patents on the cutting edge of technology, the question of how a given patent maps against prior inventions is simply not the sort of factual question that generalist district judges are well-equipped to answer.[9] Therefore, even were this Court to accept that Covidien has doubts regarding the patentability of the claims in the Patent Applications, that issue is best decided by the PTO.

---

[9] See David L. Schwartz, Practice Makes Perfect? An Empirical Study of Claim Construction Reversal Rates in Patent Cases, 107 Mich. L. Rev. 223, 260-61 (2008) ("The issues in a typical patent case may be so complex that legal minds without a background in science cannot appropriately resolve them... . Various judges have acknowledged that deciding patent law issues is extremely difficult without fully understanding the underlying technology. Thus, the technology itself may be insurmountable for generalist trial court judges").

With respect to this instant Motion, it is objectively <u>un</u>reasonable for Covidien to refuse to permit Syntheon to file a patent application simply because Covidien believes (incorrectly) that the outcome is preordained. Where Covidien's interest in the intellectual property purchased from Syntheon will not be diminished if the Patent Applications are allowed or denied, whether the claims are patentable or not is an unreasonable basis for refusing to provide consent for Syntheon to file the Applications at its own expense.

### E.  In The APA, The Parties Have Expressly Agreed That The Court May Specifically Enforce The Terms Of Their Agreement.

In the APA, the parties expressly agreed that if Covidien was in breach of any contractual provisions, Syntheon would be entitled to have this Court specifically enforce the performance of the parties' agreement. Covidien expressly agreed that a breach of any provision of the APA would result in irreparable damage to Syntheon and that Covidien agreed not to assert that Syntheon had an adequate remedy at law. <u>See</u> APA, § 9.10.

By this Motion, Syntheon seeks to have the Court find that under the undisputed facts Covidien has breached the terms of the APA by refusing unreasonably to permit Syntheon to file and prosecute the Patent Applications, enter partial summary judgment on Count I (Breach of Contract), and enter an order enjoining Covidien from interfering unreasonably in the prosecution of the Patent Applications. A proposed judgment will be filed with the Court prior to the hearing on this Motion.

## **CONCLUSION**

For the reasons stated above, the Court should enter partial summary judgment on Count I and enjoin Defendant Covidien AG from interfering unreasonably in the filing and prosecution of the two Patent Applications.

SYNTHEON, LLC

By its attorneys,

/s/ Richard J. Yurko

_____
Richard J. Yurko (BBO# 538300)
Douglas W. Salvesen (BBO# 550322)
Anthony B. Fioravanti (BBO# 664823)
YURKO, SALVESEN & REMZ, P.C.
One Washington Mall
Boston, MA 02108
(617) 723-6900

Ann Lamport Hammitte (BBO No. 553263)
Thomas P. McNulty (BBO No. 654564)
LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA  02142
(617) 395-7000

Dated: January 30, 2017

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and served electronically on all registered participants as identified in the Notice of Electronic Filing (NEF), which includes counsel for all parties.

/s/ Douglas W. Salvesen

_____

Dated: January 30, 2017